**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA ANN DESHAZIER,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 1:13-CV-00954-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |

Plaintiff Patricia Ann DeShazier, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Honorable Sandra M. Snyder, U.S. Magistrate Judge. Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence.

**BACKGROUND**

I.  Procedural History

On December 3, 2009, Plaintiff applied for disability insurance benefits. In the application, Plaintiff alleged disability beginning March 30, 2006. The Commissioner initially denied the claims

on April 9, 2010, and upon reconsideration again denied the claims on August 10, 2010.  On October 10, 2010, Plaintiff filed a timely request for a hearing.

On November 16, 2011, Plaintiff appeared and testified in front of Timothy G. Stueve, Administrative Law Judge ("the ALJ"), at a video hearing.  *See* 20 C.F.R. 404.929 *et seq.*  An impartial vocational expert, Linda M. Ferra, appeared and testified telephonically.

On November 22, 2011, the ALJ denied Plaintiff's application.  The Appeals Council denied review on April 24, 2013.  On June 21, 2013, Plaintiff filed a complaint seeking this Court's review.

II.  Administrative Record

A.  Plaintiff's Testimony (November 16, 2011)

Plaintiff, born April 24, 1964, lived with her husband and four children (ages 17, 14, eight and three years old at the time of the hearing).  Plaintiff completed high school, graduated from a two-year cosmetology school, and was able to communicate in English.  Plaintiff testified that she last worked in 2010 for Noel Financial Services as a sales representative in telephone services, had prior work as a loan officer, as a sales representative for a cell phone company, as a sales representative for a loan company, and as an in-home adult care provider.  Plaintiff testified that she was not currently working and had not worked since her last failed work attempt in 2010.

Plaintiff testified that she has had anemia since about 2000, and alleged onset of disability in March 2006.  She testified that her anemia caused her to contract frequent viruses and colds, and experience symptoms such as chronic fatigue and feeling cold.  Plaintiff testified that she experienced headaches every two to three weeks precipitated by stress and sunlight.  She also alleged mental impairment.

Plaintiff described her typical daily activities as follows: getting her children ready for school, watching television, resting, and cooking meals.  Plaintiff testified that she managed her self-care.  Plaintiff reported that she was able to handle finances, and shop for food and clothes in stores and on the computer.  Plaintiff testified that she got along with people she worked with.  She stated

that she socialized with people on the telephone multiple times per week and regularly attended church. Plaintiff testified that she maintained her driver's license and drove.

To manage her pain, Plaintiff reported taking over-the-counter medications as well as having a prescription for hydrocodone-acetaminophen, a blood pressure medication, and "Clonazepam" for anxiety. She stated that she also treated her condition with hot showers and baths, lying on tennis balls, and family-administered massages. Plaintiff stated that she was treated with iron infusions every six to twelve months, iron pills, and biweekly B-12 vitamin injections. Plaintiff estimated that she could stand for five to ten minutes before she had to sit, sit for twenty to thirty minutes, and could lift approximately three pounds. Plaintiff testified she was five foot seven inches tall and weighed 146 pounds. Plaintiff reported that she had Medi-Cal medical coverage.

B.  Adult Function Report

In her undated Adult Function Report, Plaintiff listed her physical conditions as anemia and chronic fatigue. Plaintiff reported that her medical condition limited her ability to work because she "get[s] really tired and really sleepy." She wrote that the condition of which she complains does not cause her pain or other symptoms. Plaintiff reported that her medical condition first interfered with her ability to work on March 30, 2006, and that she did not work at any time after the alleged onset date. She reported that she stopped working "[b]ecause the doctor took me off work because I was having dizziness, chest pains, and I was falling asleep at my computer at work."

Plaintiff reported that the job she performed the longest was "account exec" at a cell phone company. She reported prior work as a loan officer at a bank and as sales for a "temp agency." In describing her daily activities at her previous employment as an "account exec," Plaintiff reported that she stood on her feet all day, greeted customers, introduced the product, and did sales and computer work. Plaintiff reported that of her total hours each day she: walked eight hours, stood eight hours, sat zero hours, climbed four hours, stooped 4 hours, knelt four hours, crouched four hours, reached four hours, and wrote, typed or handled small objects for eight hours. She wrote "I

would just have to lift and carry the cell phones and accessories . . . on a daily basis . . . from the back of the store to the front." She reported that she sometimes and at most carried ten pounds, and frequently carried less than ten pounds.

In a second Adult Function Report dated January 27, 2010, Plaintiff described her daily activities as follows: she prepared breakfast for herself and her children, got them ready for school, then "fell back to sleep," prepared lunch, watched television before again falling asleep. She wrote that in the evenings she ate dinner and helped her kids with homework before bedtime. Plaintiff reported contributing to the care of her children, such as preparing meals and combing their hair. Plaintiff reported preparing "easy" meals "daily," though "at times," using a stool while cooking at the stove. Plaintiff did not report any substantive problems with personal care. As to household chores, Plaintiff reported doing "light housework" such as laundry, folding and ironing once per week, but no yard work. She reported getting help from her husband and children to do chores and yard work. She stated that she went outside three times weekly, drove, and rode in a car. Plaintiff reported that she maintained her driver's license and went out alone, though she reported "usually" taking another driver along "in case [she] became overwhelmed or exhausted." Plaintiff reported shopping for food and clothes, paying bills, but "sometimes" forgetting to do so. Plaintiff wrote that she enjoyed reading books and watching television.

Plaintiff wrote that when she stood more than 15 minutes, that she "get[s] very winded and [her] heart begins to have fast beats." Plaintiff stated that she was: easily tired, could only lift five pounds, stand about five minutes, walk about 100 feet before resting for five minutes, climb only one flight of stairs before getting winded, experiencing memory problems and concentration loss. She estimated that she followed written instructions "pretty good" and spoken instructions "okay." Plaintiff reported getting along with authority figures "fine." She reported that she has an unusual desire for sleep, even after waking from a full night's sleep. Plaintiff reported requiring extreme sleep, swelling lymph nodes, getting head and back-aches, and that she "can't function how [she]

4

used to." She reported being stressed "to the point that [she] breaks out with shingles." To treat her condition, Plaintiff reported taking anti-depressants, iron infusions, B-12 shots, and medicine for hypertension. She wrote that she suffered from panic attacks, shortness of breath, cold hands and feet, and irregular heartbeats.

    C. Third Party Adult Function Report

In a report dated January 30, 2010, Plaintiff's husband, Lonnie DeShazier, reported knowing Plaintiff since September 2004. Plaintiff's husband stated that in a typical day Plaintiff "sometimes" prepared meals, helped prepare the children for school, took a nap, watched television, ate dinner, cared for the children "as much as possible," then went to bed. He wrote that since the onset of her condition, Plaintiff "has not been able to help much at all." He noted no substantive problems as to Plaintiff's personal care. Plaintiff's husband reported that Plaintiff used to work a full-time job, was "very active" and as a result of her condition "has not been able to work at all" and "she needs assistance taking care of the kids." He reported preparing "90%" of the family meals because Plaintiff "gets tired." Plaintiff's husband reported that she went out about three days per week, could go out alone, drove and rode in cars, shopped for food and clothes at least once per month for an hour, could handle finances, talked on the phone a "couple times a week," and attended church on a regular basis. He stated that Plaintiff isolated herself from family and friends and although she used to be the life of the party, "now she is always fatigued and extremely tired and has a headache." Plaintiff's husband estimated that Plaintiff could only lift about ten pounds, stand for about five minutes, walk for about 100 feet before resting five or ten minutes, had trouble going upstairs without resting, lacked concentration, did not finish what she started, and was irritable. He further reported that Plaintiff was "pretty good" about following instructions though she preferred written instructions, and did not handle stress well. Plaintiff's husband wrote that Plaintiff "always" wanted to be alone.

D.  Medical Evidence

The ALJ properly considered the following medical records and opinions.  The objective medical evidence confirmed the diagnosis of chronic fatigue secondary to anemia.  The medical evidence confirmed that Plaintiff received treatment for these complaints from various physicians between 2005 and 2011.  During this time, there are significant periods during which the medical records show no treatment.

Records from the Bryson Cancer Care Center confirm anemia prior to the alleged onset date.  In medical records from October 2005, David Bryson, M.D., wrote that Plaintiff reported cold extremities and feeling tired most of her life.  He reported that Plaintiff had stopped taking her prescribed iron pills one and a half months prior to the date of the report because she believed they caused her constipation.  Dr. Bryson stated that Plaintiff had symptoms and lab findings consistent with iron deficient anemia, probably due to malabsorption from gastric bypass, accompanied by ongoing losses through menses.  Medical records show that several days later, Plaintiff received an iron infusion via intravenous fluids.  Plaintiff returned to Dr. Bryson in February 2007, at which time she complained of light-headedness, exertional dyspnea, splitting fingernails, and fatigue.  In the medical records, Dr. Bryson noted that the Plaintiff had not taken any iron for several months before becoming symptomatic.  Subsequently, she was again infused with iron and Dr. Bryson scheduled a follow-up for between two and six months.  From these same records, the Plaintiff reported further complaints of fatigue in September 2008, June 2009, July 2009, September 2009, March 2010, May 2010, and October 2010.  She received iron infusions in May 2010 and October 2010.

In medical records dated December 9, 2009, from the Plaintiff's treating physician at Visalia Medical Clinic, Angelina Mallari, M.D., the doctor noted that "the patient denied acute illness . . ." and as to her musculoskeletal condition, "patient denied body pain."

On March 15, 2010, the consultative doctor, Greg Hirokawa, Ph.D., conducted a thorough examination and reviewed the available medical evidence, including treatment records and

diagnostic reports. Dr. Hirokawa took a detailed history from Plaintiff during the consultative review. Dr. Hirokawa noted that Plaintiff had no psychiatric hospitalizations or prior suicide attempts, and she was not receiving mental health treatment. Dr. Hirokawa found the results of Plaintiff's mental status examination "unremarkable." Dr. Hirokawa administered psychological testing, the results of which were within an average range. Dr. Hirokawa diagnosed Plaintiff with panic attacks without agoraphobia and low average intellectual functioning, and noted her mild difficulty in social functioning. Dr. Hirokawa opined that Plaintiff showed mild impairment in some functional areas, found mild to moderate limitations in her ability to interact appropriately with peers and supervisors, and mild to moderate impairment in her social judgment. He also opined that Plaintiff was unable to manage her finances.

On March 11, 2010, the State agency medical consultant, Lydia Kiger, M.D., catalogued significant objective findings, noting the following: in February 2007, Plaintiff experienced fatigue and lymphadenopathy; Plaintiff had a gastric bypass many years ago, subsequently she did not respond to oral iron when anemic and required intravenous iron; Plaintiff had been treated with intravenous iron twice previously, in October 2005 and February 2007; in July 2009, Plaintiff complained of chronic fatigue and back pain from scoliosis; in December 2009 Plaintiff had follow-up care for her 2008 bilateral tubal ligation; in March 2010, Plaintiff was not receiving and had no history of mental health treatment or medications. Dr. Kiger opined that Plaintiff was partially credible in that her reported symptoms were supported by diagnosis, but the alleged degree of functional limitations was not supported by the objective medical evidence. Dr. Kiger concluded that Plaintiff's anemia and secondary chronic fatigue are non-severe and do not meet the criteria for disability.

On March 31, 2010, an osteopath, Reed Vuong, D.O., gave the Plaintiff a prescription for Lotrel and Fergon. In progress notes dated March 31, 2010, Dr. Vuong reported that the Plaintiff had chronic fatigue and "also has chronic anemia, iron def[iciency] since gastric bypass . . . but has

7

not had iron infusions recently." Dr. Vuong noted that Plaintiff was taking Zestril and he was changing her to Lotrel. In a letter dated May 13, 2010, Dr. Vuong wrote that the Plaintiff "has been permanently disabled since April 2007. She has chronic fatigue and chronic iron-deficiency anemia for which she must get iron infusions . . . She has fatigue with any exertion and has been unable to work since she has been my patient." In Dr. Vuong's patient chart for Plaintiff, the "Major Problems" and "Diagnoses" sections were blank. In progress notes also dated May 13, 2010, Dr. Vuong noted that the Plaintiff was "better now on Lotrel. [Plaintiff] is applying for SSI disability. She has not worked since April '07 due to chronic fatigue and iron deficiency anemia." Dr. Vuong reported that in a review of systems, Plaintiff's constitutional, cardiovascular, and respiratory results were "negative." In his general notes from the same date, Dr. Vuong wrote that Plaintiff is "[w]ell appearing, well-nourished in no distress." Dr. Vuong recommended that Plaintiff schedule follow-up in three months.

In a report dated August 5, 2010, the Disability Determination Service physician, Roger Fast, M.D., reviewed Plaintiff's case materials including medical records from the Bryson Cancer Care Center and Dr. Reed Vuong. Dr. Fast opined that Plaintiff's anemia and hypertension were nonsevere, and that her fatigue did not meet the standard for disability. Dr. Fast noted that Plaintiff had no history of psychiatric treatment. Dr. Fast recommended that the Commissioner adopt the prior determination that Plaintiff mental and physical condition was nonsevere. Dr. Fast concluded that he would affirm the initial determination.

E. Vocational Expert Testimony

Linda M. Ferra testified as vocational expert. She classified Plaintiff's past relevant work as a sales representative as "Specific Vocational Preparation (SVP) level 6, light exertional level" and her work as a loan officer as "SVP 7, sedentary exertional level." Considering the demands of that work, the limitations of Plaintiff's residual functional capacity ("RFC"), and the Plaintiff's entire

medical-vocational profile, Ms. Ferra testified that a similarly capable individual would be able to perform the demands of Plaintiff's previous positions as it is actually and generally performed.

## LEGAL STANDARD

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C .F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not,

in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404 .1520, 416.920.

## DISCUSSION

Plaintiff argues that the ALJ erred by rejecting the testimony of Plaintiff's treating physician and in his assessment of Plaintiff's credibility. The Commissioner replies that the ALJ did not err in relying on the opinions of Drs. Hirokawa, Fast, and Logue, who were consistent with the objective evidence of record and the conservative treatment provided to Plaintiff, and in rejecting Plaintiff's subjective reports and Dr. Vuong's opinion based on Plaintiff's self-serving complaints.

### I.   The ALJ's Determination

Based on the weight of the physicians' opinions, the ALJ concluded that the Plaintiff's subjective complaints were greater than the objective findings and not consistent with the objective medical evidence.

Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 2006. Her severe impairments were chronic fatigue secondary to anemia. None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. The ALJ found that a restriction to light exertional activity was consistent with the longitudinal medical record. In doing so, he considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. Plaintiff was capable of performing her prior work as a sales representative in telephone services, and the full range of light

work as defined in 20 C.F.R. § 404.1567(b), with no modifications.  Accordingly, Plaintiff was not disabled, as defined by the Social Security Act.

## II.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If the ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence, this Court must uphold the ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002, 104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burch*, 400 F.3d at 679.  Where the evidence as a whole can support either outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## III.    Whether the ALJ Failed to Properly Weight the Medical Evidence

Plaintiff contends that the ALJ failed to give specific and legitimate reasons for rejecting the opinion of her treating physician, Dr. Vuong, in favor of the consultative examining physician Dr. Hirokawa, and Drs. Fast and Logue.  Plaintiff argues that the ALJ should have fully credited Dr. Vuong because he was a treating physician and his opinion is allegedly consistent with the overall record.

//

//

11

A. Plaintiff's Credibility

Before considering medical opinion, the Court finds it relevant to consider Plaintiff's credibility, an important factor in evaluating her claims. The ALJ found that although Plaintiff's reported symptoms were consistent with objective medical evidence, her reports of the intensity, persistence, and limiting effects of her symptoms were not fully credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is

12

supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The ALJ highlighted the insufficiency of the evidence supporting Plaintiff's allegations of total disability. The ALJ noted that while Plaintiff made intermittent complaints of fatigue supported by laboratory findings of low iron levels, her medical treatment was conservative and limited to medication and sporadic iron infusions. The ALJ emphasized that, in contrast to her allegations of complete disability, the Plaintiff reported remaining quite functional. Plaintiff, her husband, and the medical records demonstrate that she continued to care for her children, perform self-care without assistance, perform some household chores, cook easy meals, shop in stores, use a computer, go out three times per week, attend church regularly, handle finances, maintain her driver's license and drive alone. Additionally, Plaintiff complained of back pain, symptoms beyond anemia and chronic fatigue. Yet there was no imaging evidence or abnormal physical examinations to support a disability finding on that basis.

Further inconsistencies exist in Plaintiff's claims to the agency and her representations to some physicians and their objective records. For example, Plaintiff testified that she had mental impairments, despite the absence of medical records showing a history of mental health treatment. Further, Plaintiff testified to the ALJ that she could not work due to her chronic fatigue and that her alleged onset of disability was in March of 2006. In medical records, however, Plaintiff complained of these symptoms on dates preceding her alleged onset date, putting the date at 2000 or earlier. In medical records from Bryson Cancer Center dated October 2005, Dr. Bryon noted that the Plaintiff reported that she had experienced symptoms such as cold extremities and feeling tired for most of her life. Despite experiencing symptoms in that time period, Plaintiff reported in her adult function report that her longest continuous employment was between 2000 and 2005. This Court also notes that medical records from 2009 show that Plaintiff denied experiencing acute illness or any bodily pain at that time.

13

Despite Plaintiff's allegations that she is entirely disabled, the medical records reveal only inconsistent and conservative treatment of Plaintiff's condition. The ALJ highlighted that despite Dr. Vuong's suggestion that she receive iron infusions every two months and despite Plaintiff's own complaints of fatigue on seven occasions, Plaintiff received only three infusions since April 2007.

In short, the record supports the ALJ's conclusion that Plaintiff lacked credibility as to the degree of her functional limitations. Because of Plaintiff's lack of credibility, every medical opinion presented must be evaluated in light of its dependence on Plaintiff's self-serving representations. The ALJ properly did so, limiting his reliance on opinions which were based on Plaintiff's subjective representations of her physical condition.

B.  Expert Medical Opinions

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, a treating physician's opinion is entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a nontreating physician. *Id.*, *see also* 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "An ALJ is not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041;

14

S.S.R. 96-5p.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.  An ALJ must determine a claimant's RFC based on "all relevant evidence in the record." *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.

Where a treating or examining physician's opinion is uncontradicted by another doctor, the ALJ must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  The ALJ must tie the objective factors of the record as a whole to the opinions and findings that she rejects.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary.  *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Magallanes* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Plaintiff contends that the ALJ erred by favoring the objective opinions of examining and non-examining physicians, who agree that Plaintiff is not disabled, over a treating physician's objective opinion and Plaintiff's subjective opinion that she is disabled.  However, the ALJ carefully analyzed the various expert opinions regarding Plaintiff's RFC, including those of the consultative physician, Dr. Hirokawa; and of the non-treating physicians, Dr. Kiger and Dr. Fast, as well as the

treatment and other objective medical records. The ALJ explained in detail his preference for the opinion of the physicians, whose consultative reports contemplated Plaintiff's various symptoms and diagnoses, the objective medical evidence, and her conservative treatment regime. The ALJ appropriately gave weight to these physicians who – all but one – agreed that Plaintiff was capable of light work.

The ALJ limited the weight he gave to the Plaintiff's opinion since it rested primarily on Plaintiff's own unreliable account of her medical history and her reports of symptoms greater than and inconsistent with the objective medical records. Similarly, he gave little weight to Dr. Bryson's opinion, primarily because his report covered a period prior to Plaintiff's alleged onset date. State agency medical consultants reviewed Plaintiff's medical records and all agreed that her impairments were not severe. However, the ALJ ultimately gave little weight to the State agency consultants who found Plaintiff's condition nonsevere because the medical records confirm treatment of low iron levels with several iron infusions. The ALJ gave great weight to Dr. Hirokawa's opinion because his conclusion was consistent with the longitudinal medical evidence. The ALJ rejected Dr. Vuong's opinion as to Plaintiff's disability on the basis that Dr. Vuong was not only contradicted by both the consultative and state agency physicians, but also by *his own* objective medical records. The ALJ reasoned that treatment records showed that Dr. Vuong only saw the Plaintiff once in the year prior to the hearing, and records from his last examination show that Plaintiff's results were normal. Dr. Vuong's conclusions appeared to be based solely on the Plaintiff's subjective reports.

This Court concludes that substantial evidence supported the ALJ's determination to favor the opinions of three other doctors and the entirety of the objective medical records, and to reject Dr. Vuong's conclusory letter and Plaintiff's self-serving opinion. Since the ALJ gave specific, well-articulated, and legitimate reasons for rejecting the osteopath's medical opinion, and those reasons were supported by substantial evidence in the record, the ALJ did not err in his assessment of the

16

relative credibility of Plaintiff and the various medical experts, nor in his decision to favor the opinion of the majority of the physicians over that of Dr. Vuong and the Plaintiff.

### III.     Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court **DENIES** Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **July 21, 2014**                               /s/ Sandra M. Snyder
                                                    UNITED STATES MAGISTRATE JUDGE